Good morning, Your Honor. Stephen Montoya here on behalf of the appellant Robert Christopher. As Your Honors are aware, this case involves a racial harassment case. Specifically, an individual of Asian descent, Robert Christopher, was employed as a foreman at a commercial electrical contractor in Phoenix, Arizona, named Spectra Electrical. And his boss, my client's boss, a guy named Eric White, who was the general foreman of the project, he was in charge of all the other foremans, called my client a series of racial slurs, a coconut, a pineapple, a Cochise. Does management know about this? Yes, Your Honor, in two ways. And I have to answer that question chronologically. First of all, management knew about it, Your Honor, because a manager, a general foreman, was the perpetrator of the harassment. Second of all, the general foreman's boss, his name was Wes Ostrander, also heard Mr. White make discriminatory comments at work, not to my client, but in reference to other racial minorities. And instead of doing anything about it, he just laughed. Second of all, I have to answer that question chronologically, Judge Silverman, because unquestionably, no one can deny, Spectra admits, that Spectra knew about it just a few days after my client was fired by Mr. White on October 29th of 2008. It's ER-169. It's the union complaint. On November 4th of 2008, just to be clear, he was terminated. However, Judge Fischer, it was only just a few days. Well, so … And we'll talk about the significance of that. Our view is that it's insignificant, because the employer knew. And once an employer knows, under this Court's longstanding case law, an employer has a duty to do something. Yes. Two things. I don't mean to interrupt you, Your Honor. You look like you want to ask a question. Well, I do, because I'm not sure. Are you arguing that they are directly liable for the failure to enforce before? Or are you arguing that they're precariously liable because it was a management-level employee who committed the act, and then they didn't carry out the – they didn't have a good-faith effort to comply with Title VII? Judge Fischer, I'm arguing both. Okay. If … Did you argue both? Yes. Below? And the jury instructions ultimately given to the jury reflected both theories. Supervisory theory. If Eric White was a supervisor, then the employer's vicariously matter is a matter of law, unless there's no tangible employment action. If there is a tangible employment action, there's the affirmative defense under Ellerth and Farragher. However, suppose Mr. White was not a supervisor. Suppose he was a non-supervisory manager. It would still be liable, because in reference to co-employee harassment, once the employee knows or should know of the harassment, it still has the same duty under the law to take prompt and effective remedial measures. Let's assume that Mr. White was not a supervisor. Spectra still knew about the harassment as of November 4th of 2008, just a few days after he was fired, because he complained about it in writing, and the union gave Spectra a copy of the complaint, which Spectra admits. And after Spectra learned of the discriminatory harassment, Spectra had a duty to investigate. Now, the mere fact, and this is really what this case is all about, what are an employer's duties to a former employee in the context of a complaint of discrimination? And our response is, they're the same duties that an employer always has. For example, suppose plaintiff, in essence, a private attorney general, to enforce the Title VII principles in the workplace, even though whatever remedial action might be taken at that point will not benefit him, but might make working conditions at that particular company better? I would answer that question, Judge Tallman, yes and no. He's not totally an attorney general, because he's also complaining for himself, because as you know, one of the remedies under Title VII is reinstatement. But aren't we talking about taking effective remedial measures to, in essence, stop the name-calling? To stop the name-calling, but also to stop discrimination directed at third parties. And this Court's case law has really been uniform in reference to the two-pronged purpose of Title VII and the other civil rights laws. One purpose is to make the victim whole. Hey, if you've been fired because you're Mexican-American and it was discriminatory, you get your job back. The other one is deterrence. Yes, Judge Fischer? Aren't we talking about punitive damages here? We are, but — Comparative — I mean, compensatory damages have already been awarded, right? Yes, Your Honor. However — He didn't seek reinstatement. No, but he did seek punitive damages. Under this — This is about punitive damages, and the standard for that's higher than just liability under Title VII. It is, because under Title VII, Judge Fischer, as you are aware, in disparate impact cases, there's no intentional discrimination, so there's no compensatory damage, and there's also no punitive damages. But under this Court's opinion in 2000, Pazentino v. Johnson & Johnson, this Court announced and has not equivocated from that ruling in the 15 years since it was issued, 16 years now, that intentional discrimination is enough to establish punitive damages. And moreover, this Court's opinion in Swinton v. Potomac, 270 Fed 3rd at 807, recognizes that racial harassment is a form of intentional discrimination. And once an employer has knowledge of that intentional discrimination, it has a duty to act. And this Court has uniformly held that if it doesn't act, then the employer is liable. And actually, let's talk about reckless disregard. If an employer gets notice in writing from a union, from the EOC, from a State law enforcement agency, that one of its good employees is being discriminatory harassed and, in fact, has quit or been fired as a result of that harassment, that employer has a duty to investigate. And if that employer fails in that duty, that is a reckless disregard of a Federally protected right that subjects that employer to liability for punitive damages. In fact — and then I'd like to reserve the rest of my time for — Alito, before you sit down — Yes, Judge Talman. — I have a problem with the procedural process with regard to the punitive damages claim. Yes, Your Honor. And I'm referring specifically to the fact that the motion was made mid-trial to revisit the punitive damages claim, but before Brunia and Campbell testified. So don't we have to evaluate the propriety of the District Court's mid-trial ruling without looking at the subsequent testimony? The motion was never renewed following the testimony. And based upon that fact, we're not going to press that argument this morning, because, of course, if we prevail on our appeal from the summary judgment, that becomes moot. Similarly, we didn't brief the failure to ask for a jury instruction regarding punitive damages, because if you look at the final pretrial order, we know that had already been decided on a motion for summary judgment, and in the pretrial order itself, we said we intended to appeal from that. If Your Honors have no further questions at this juncture — I'm not clear of your answer to Judge Talman. You say you're not going to press that argument. I'm not clear which argument you're not going to press, which one. That is going to — the motion for reconsideration — the appeal from the denial of the motion for reconsideration, Judge Silverman. Thank you. Thank you. Mr. Workin. May it please the Court, my name is Charles Workin. I represent the Appellee Spectra Electrical Services. I think it's important to set the procedural stage here accurately. And first of all, let me say the issue here is whether there was a basis for the award of punitive damages. This is a summary judgment case. This is not an appeal from a jury verdict. The Spectra moved for summary judgment on three bases, two of which concern punitive damages, and only one of which is at issue here today, and that is whether there was any basis for an award of punitive damages. The basis that was offered by plaintiffs was that Spectra had failed to provide investigate and to interview witnesses and to discipline Mr. White after Mr. Christopher had quit his employment and had complained to a third party, his union. That was it. The basis was not that Mr. White had been calling Mr. Christopher names over a period of time, and that Spectra would be vicariously liable for that name calling during employment. But you argued, you apparently understood it to be a vicarious liability theory in part because that was the basis of your defense, and it seemed it was talked about in the proceedings as a vicarious liability theory. Your Honor, alternately, we argued that in the motion for summary judgment. First of all, we argued that there was no hostile work environment going to the merits of the claim itself. And secondly, we argued that there was no basis for an award of punitive damages based on the alleged failure to investigate and interview and discipline. And thirdly, alternately, we argued that there should be summary judgment on the claim itself. There was no vicarious liability because this employer had, in good faith, adopted and implemented and enforced programs within its company to prevent discrimination. Now— Let me ask you about that. Do I understand correctly that there was an interrogatory answer to the effect that after your folks learned about the complaint to the union, Tom Campbell undertook an investigation? That's what the interrogatory answer said. Is that right? Your Honor, I didn't quite hear that. I'm sorry. I understand that an interrogatory was propounded to you— Yes. —to your side that says, what did you do to investigate? And the answer was to the effect that after you got the investigation, Tom Campbell talked to those who would have knowledge of the incident. Yes. And then it turns out that Campbell testifies that's not true. Is that right? No. What his interrogatory answer as to Mr. Campbell's actions after Spectra learned of the complaint are true. That answer is true. Campbell did investigate. He did investigate. What happened at — and first of all, I'm going to say, as you already know, that the review of this summary judgment order is limited to the record that was before Judge Campbell at the time he granted the motion for summary judgment. We are not to be considering, this Court should not be considering, testimony that was offered at trial. So I think the case law of this Court is clear on that. The leading case cited in the brief— I'm trying to make sure I understand what the facts are. I understood the facts to be that Campbell contradicted the interrogatory answer at trial. He did not. What did he say at trial about investigation? He said what he did, and what he did was describe an answer to that interrogatory. What did he do after it came to his attention that there was a complaint?  When was that? How far after the event? That was within — I believe the complaint to the union was made three or four days post-quit, and the union began its own investigation and provided the complaint form to Spectra, and then Spectra conducted its investigation. And so it would be in the neighborhood of a week, seven days after quit, give or take. I don't know precisely. It wasn't after the EEOC issue? It was before. It was well before that, because the complaint to the EEOC wasn't made until still later, and the determination by them very much later. There is in the record a witness statement from Eric White. There would be a date on that that would fix it in point of time relative to the date of quit by Mr. Christopher. I'm going to say it was about a week after, but in any event, it was not — I know it wasn't a day or two later, and I know it wasn't a month later. And Mr. Campbell testified that he interviewed Mr. White, had Mr. White complete one of the company's witness statement forms, and I don't have the interrogatory answer in front of me, Your Honor, as to what else Mr. Campbell did. Now, he did not — he did try — he did try to reach Mr. Christopher by phone. Who's he? Mr. Campbell tried to reach Mr. Christopher by phone and was unsuccessful. And the other witness that was named in Mr. Christopher's complaint form, a Mr. Salt, was someone who didn't work on the job at all. He was a CAD, a computer-aided drafting person who worked in the office, and he didn't know anything about name-calling. And the person that was later said to have been someone that should have been interviewed, Jason Atkinson, no longer worked for the company. He had left months before. But yet we're criticized for not contacting Mr. Atkinson, Your Honor. Well, I'm a little confused, because I understood that the first notice the inspector got was the, I guess, the union complaint. Yes, that's correct. That was after he had left. Yes, sir. Now, the counsel said, well, White was involved. He's a direct supervisor. He's presumably a management-level employee. And he mentioned somebody else who had overheard the name-calling, so I understand the sequence. And that was before, so he's suggesting that there is a triable fact as to whether Spectre knew before. Well, let's get the... I don't want to interrupt. Let's get the facts straight. Mr. White was a general foreman, but he is the one that was doing the name-calling. And the issue here is whether Spectre knew of the name-calling. And so White is the one doing the name-calling, and he's not telling Spectre that he's engaged in any name-calling. And he didn't engage in any name-calling in front of other supervisors, or he didn't engage in the name-calling at meetings of the supervisors. And Mr. Ostrander, who was referenced, who was Mr. White's boss, the facts are that the name-calling didn't occur in front of Mr. Ostrander. Instead, Mr. White was telling a racially inappropriate joke, and in the presence of Mr. Ostrander and Mr. Christopher. And that's something wholly separate and apart from this name-calling. Okay, but if White is a management-level employee, that's half of the vicarious liability exposure. Because you have a management-level employee who is engaging in discriminatory, allegedly discriminatory conduct. Now, the defense that the company has is that White was acting contrary to a stated policy that's enforced. And my understanding is that the witness, Crawford, on behalf of Spectre about the program, the policy and so on, had virtually no knowledge about it. That didn't answer the question. So therefore, there's arguably a tribal issue about whether the company actually was acting in good faith to implement and enforce Title VII-compliant programs. That would all be correct if the basis of punitive damage, in this case, was vicarious liability. Instead, it was not. Well, I don't know. I look at the interrogatory answer about the basis. This is E.R. 547, and it says, his direct supervisor, Eric White, called them a series of discriminatory names in the workplace. When Mr. Christopher ultimately complained about the conduct to this union, Spectre did not reasonably investigate the complaint or take any corrective measures against Mr. White. Spectre thus failed to reasonably implement its alleged standard discrimination policy and so, therefore, is liable for punitive damages. That sounds like vicarious liability. That is not how I don't think any of the rest of us viewed it at the time. Judge Campbell didn't, as he notes in a footnote in his order. No, he said that they didn't make the – we're making that claim. That seems to be a vicarious liability if it's a management-level employee. That is not how the issue was framed and argued by both sides at the time of the summary judgment and, in fact, in the response to the motion, which in the motion clearly distinguished between direct liability and vicarious liability and pointed out that they weren't arguing a vicarious liability basis. In the response to the motion, it simply said because Spectre failed to investigate and discipline Christopher's claim for punitive damages, it did not argue that the basis was vicarious liability. It did not argue that the basis was not a form of direct liability simply for not investigating. And Spectre had no legal obligation to investigate after Mr. Christopher quit, and even if it failed in some measure to investigate after he quit, there was no evidence at the time of the summary judgment motion or later that its actions were reckless or with malice or malicious, I should say. So when properly framed, when the issue is properly framed in this case, there simply was not a legally sufficient basis for punitive damages, and the summary judgment was properly framed. Thank you. There was no investigation. I think even a Keystone cop would interview the victim of purported misconduct. How can you have a good-faith investigation if the victim is not interviewed? They said they tried to reach him. Well, yeah, but when you look at the record, they weren't trying to reach him to find out what happened. On day one, Eric White called my guy a pineapple. My guy got sick of it and left the workplace without telling anyone. He just walked out. They tried to call him a bunch of times because they didn't know where he was. He finally answered at the end of the day when Eric White called him, and Eric White called him begging him to come back to work. He came back to work the next day, and Eric White fired him. That's why they were calling him, because he had walked off the job without any explanation. The record is clear. Mr. Workin asked him. He had the same cell phone number. They did not try to communicate with him. And as a matter of fact, ER191, the president of the company, who was also their 30B6 deponent in reference to discriminatory practices or anti-discrimination practices and procedures, page 191, I asked him, wouldn't you want to interview the victim? And he said no, because he didn't work there. And Let me ask you this. Is there a case that we can put our finger on that says if the employers learn about discrimination after the employee has already left? Well That the horse is out of the barn. These guys already left. There's nothing you can do about it now. Is there any case that says they have to investigate? I think there are, Your Honor, and I think they're the cases that arise in reference to job applicants. If you don't No, I'm not asking about job applicants. I'm asking about a situation I just asked you about. The best citations I have, Your Honor, are Fuller v. City of Oakland, Dawson v. Intec, and Swenton v. Porter, cited on page 8 of our reply brief, because in those cases, this Court maintains its uniformity of saying once an employer learns of discrimination, whether it's by a supervisor or by a coworker, it has a duty to act. And that's why all of this argument, well, he wasn't a supervisor, was there vicarious liability, whether he was a supervisor or not, whether he was a coworker or a supervisor, once the employer had learned of the discrimination, it had a duty to act. Former employees are not exempt from Title VII's force. They are subject to its protections just like anyone else. Then I'll be quiet. In fact, some former employers have been injured worse because suppose you fire someone based upon their race, and then they complain, oh, well, he's no longer employed here. I don't have a duty to investigate. I don't have a duty to do anything. In fact, that would actually encourage employers to terminate employees to alleviate them of their duty to investigate and discipline. Thank you. Roberts. Thank you, Mr. Worken. Thank you. And good morning or good afternoon, as the case may be. Thank you so much. Thank you.  We'll stand and recess.
judges: Silverman, Fisher, Tallman